# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JANET M. DIERCKS, individually
and d/b/a J & C BUTTE KENNELS,**

           Plaintiff,

      **-vs-**

**STATE OF WISCONSIN DEPARTMENT
OF ADMINISTRATION, GEORGE LIGHTBOURN,
F. SCOTT SCEPANIAK, DAN SUBACH,
CHRISTOPHER M. PATTON, STATE OF WISCONSIN,
DEPARTMENT OF JUSTICE, JAMES E. DOYLE,
JAMES R. WARREN, JOHN A. PALMER,
KYRA M. SCHALLHORN, et al.,**

           Defendants.

**Case No. 02-C-988**

## DECISION AND ORDER

### INTRODUCTION

The plaintiff, Janet Diercks ("Diercks"), owned and operated a greyhound dog kennel and racing business at the Geneva Lakes Greyhound Track ("Geneva Lakes"). Suspecting that Diercks was using illegal performance enhancing steroids on her dogs, the Wisconsin Department of Administration – Division of Gaming ("WDOG"), in conjunction with the Wisconsin Department of Justice – Division of Criminal Investigation, Gaming Enforcement Bureau ("DCI"), installed surveillance cameras in Diercks' kennel unit at Geneva Lakes. The surveillance cameras, in place for two

months, revealed that steroids were being used. Subsequently, Diercks pled no contest to one count of misdemeanor cruelty to animals and her racing license was revoked.

Diercks alleges that the installation of surveillance cameras in her kennel unit constitutes an unreasonable search and seizure in violation of the Fourth Amendment. Both parties have moved for summary judgment. For the reasons that follow, the Defendants' motion is granted, Diercks' motion is denied, and this matter is dismissed in its entirety.

## BACKGROUND[1]

Diercks' greyhound racing business was called J & C Butte Kennel, Inc. In 2002, Diercks entered into a contract with Geneva Lakes so that she could conduct her dog kennel and racing business at that track. Pursuant to that contract, Diercks housed greyhounds in a kennel unit located in a kennel compound at Geneva Lakes. Diercks held an Owner and Occupational license issued by the WDOG. Jeremy Michaud ("Michaud") was her licensed trainer.

The kennel compound at Geneva Lakes is located on the racetrack environs. It is surrounded by a chain link fence and contains a commissary and five buildings, each consisting of four units. Each unit contains space for a particular greyhound kennel owner or operation. The units contain an area for up to 72 crates for the housing of greyhounds, along with a work area with a countertop, cabinets, refrigerator, sink and

---

[1] The following facts are undisputed unless noted otherwise.

-2-

water faucets. Attached to each unit are outside fenced "turnout" pens for the greyhounds' outside use. Each kennel unit has two entrance doors with locks.

Diercks considered her kennel unit a private workplace. Diercks ran her business out of the kennel unit at Geneva Lakes. She purchased and brought into her kennel unit a file cabinet to hold business records, such as invoices, delivery slips, paperwork for the dogs, and lease agreements with greyhound dog owners. Diercks had her own set of keys to lock and open the doors to her kennel unit. Occasionally, Diercks would change her clothes in the kennel unit after she finished getting the dogs ready to race.

The interior of the kennel was not open to public view. The kennel had no windows, except for a small window located in the front door which was covered with a piece of cardboard at all times. The kennel doors were kept closed, but were occasionally left open to air out the kennel. The kennel was closed to the general public, security guards were posted at the entrance to the kennel area, and only those whose names appeared on the Geneva Lakes list of approved visitors had access to the kennel areas. Moreover, approved visitors had to sign-in and sign-out when accessing the kennel area.

As part of its regulatory duties, and by custom and practice, the WDOG has unrestricted access to the Geneva Lake kennel unit keys (located at the track security office) as needed to carry out the WDOG's regulatory role. Wisconsin Statute § 562.02(2)(d) states that the department may "[w]ithout a warrant, inspect any racetrack and examine any book or other record of a licensee . . ." Wis. Admin. Code § WGC 4.07(10) requires all kennel contracts to contain the following clause: "Each kennel . . . shall permit *unrestricted access* to said kennel by the division and its designated representatives" (emphasis added).

Diercks (d/b/a J & C Butte Kennel) entered into a contract to participate in racing operations at Geneva Lakes. Paragraph 25 of the contract states: "Kennel Owner shall permit any and all members of the DOA-Division of Gaming [WDOG] and/or any designated representatives of said [WDOG], to have *unrestricted access to the Kennel at all times, without prior notice*, and such access shall be deemed to include any and all physical facilities assigned to the Kennel Owner by [Geneva Lakes] whether such kennels are located at the Racetrack or elsewhere" (emphasis added).

In addition to urine sampling, and pursuant to WDOG's Wagering, Racing and Enforcement Manual, WDOG conducts routine kennel area inspections to ensure compliance with the rules and regulations governing the care and treatment of racing greyhounds. Special inspections or investigations are conducted as needed, with approval from the administrator of the WDOG. Routine, unannounced inspections of each kennel unit are to take place monthly. Kennel units are chosen at random for inspection. If a kennel owner or trainer is not on site at a kennel unit during inspections, the WDOG stewards may obtain keys from the racetrack security personnel to open and inspect the unit.

In early 2001, the WDOG field staff became concerned over the alleged use of Boldenone, an anabolic steroid, in Wisconsin greyhound racing. As a result, Daniel Subach ("Subach"), Chief Steward of the WDOG, gained a working knowledge of the use of Boldenone in greyhound racing. Specifically, Subach learned that Boldenone metabolized so rapidly in a greyhound's system that it was difficult to detect in a greyhound's urine. Subach consulted various experts who agreed that there was no proven method for detecting Boldenone in a greyhound's urine.

On or about February 25, 2002, Doctor Jennifer Barker ("Barker"), a WDOG veterinarian at the Dairyland Greyhound Park ("Dairyland") in Kenosha, telephoned Subach to inform him that a kennel operator with ties to colleagues working at Geneva Lakes approached her in person at Dairyland. Wishing to remain anonymous, the kennel operator/informant related specific information to Barker regarding the alleged use of Boldenone by Michaud at Diercks' J & C Butte Kennel in Geneva Lakes.

On February 26, 2002, Subach discussed the information via teleconference with Barker, Christopher Patton ("Patton"), Agency Liaison for the Office of the Wisconsin Governor, and Kyra Schallhorn ("Schallhorn"), Special Agent for the Gaming Enforcement Bureau of the Division of Criminal Investigation of the Department of Justice. Barker explained that Michaud was alleged to be using Boldenone on greyhounds housed by the J&C Butte Kennel. Barker told them that the kennel operator/informant claimed a box containing Boldenone and other substances was delivered to Michaud at his residence at the Delavan House Hotel in Delavan, Wisconsin approximately every two weeks. Barker told them she believed the informant to be truthful based on their prior professional interactions.

Schallhorn took the information to John Palmer ("Palmer"), Criminal Investigation Director for the Gaming Enforcement Bureau. Schallhorn and Palmer discussed with several DOJ attorneys whether a search warrant was needed in order to enter the J & C Butte Kennel assigned kennel space to install videotape surveillance equipment. They were advised that one was not needed based on the language of Wis. Stat. § 562.02(2)(d) and the terms of Paragraph 25 of the kennel participation contract between Geneva Lakes and J & C Butte Kennel. Schallhorn and Palmer also procured an opinion from the

Walworth County District Attorney, Phillip Koss ("Koss"). Based on the same information, Koss also advised that no search warrant was needed.

Schallhorn discussed Koss' opinion regarding the warrant situation with Subach and Patton. Subsequently, Subach and Patton went to WDOG Administrator F. Scott Scepaniak ("Scepaniak"). Scepaniak approved WDOG's continued participation and cooperation in the investigation and advised Subach and Patton that the investigation was authorized under §§ 562.02(2)(c) and (d), Wis. Stats., and clause number 25 of the kennel contract.

During the evening of March 19-20, 2002, Patton, along with special agents from DCI's Technical Services Unit, entered the J & C Butte Kennel area to install video recording equipment. This equipment was only capable of recording video, not sound. The videotape equipment was removed on May 22, 2002.

From their review of the videotapes retrieved from this surveillance, Schallhorn and Patton observed that they showed Michaud handling injectable needles and administering shots to greyhounds on four separate occasions: March 26, April 9, April 10 and April 27, 2002. On the first three dates, Michaud appeared to be alone in the kennel, and on April 27, 2002, Diercks and her son were present in the kennel with Michaud. Schallhorn and Patton also observed Diercks handing injectable needles to Michaud on the latter date.

At the conclusion of video surveillance, the WDOG conducted a Stewards' Inquiry on June 26 and August 29, 2002, alleging administrative rule violations based on the video images captured during the investigation of the J & C Butte Kennel. On September 1, 2002, the Board of Stewards issued Ruling numbers 20023089 and 20023090. Ruling

Case 2:02-cv-00988-RTR   Filed 12/20/06   Page 6 of 20   Document 92
-6-

number 20023089 assessed a forfeiture of $500 and suspended Diercks' license for three days for assisting with the injection of a substance into a greyhound in violation of § WGC 14.09(2), Wis. Adm. Code. Ruling number 20023090 also assessed Diercks a forfeiture of $500 and suspended her license for a period of three days for being in possession of a hypodermic syringe in violation of § WGC 14.09(1).

Diercks appealed the Stewards Rulings, arguing that they were invalid because they relied upon evidence obtained in violation of her constitutional rights. The Administrative Law Judge rejected this argument and affirmed the Stewards Rulings because Diercks "did not enjoy a Fourth Amendment right to have relevant evidence obtained from the video surveillance excluded from the Stewards' proceedings." (Plaintiff's Proposed Findings of Fact, ¶ 29).

In December 2002, criminal charges were filed against Diercks in Walworth County, based upon information obtained from the covert video recordings. In January 2003, Diercks pled no contest to one count of misdemeanor cruelty to animals. Diercks' occupational license was revoked pursuant to Wis. Stat. § 562.05(5)(a)(1), which provides that no racing license may be issued to any person who has been charged with a felony.

## ANALYSIS

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

Case 2:02-cv-00988-RTR   Filed 12/20/06   Page 7 of 20   Document 92
-7-

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Diercks brought claims under 42 U.S.C. § 1983 and Title III of the Omnibus Crime Control and Safe Street Act, 18 U.S.C. §§ 2510-2519. Plaintiff concedes that she cannot state a Title III claim because Title III does not regulate silent video surveillance. *See United States v. Torres*, 751 F.2d 875, 880 (7th Cir. 1984). Plaintiff also concedes that her § 1983 claim should be dismissed with respect to defendants George Lightbourn, James Doyle, and James R. Warren, as these "elevated personages lacked the requisite personal involvement for § 1983 liability." (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, p. 2). What remains is Diercks' claim that the remaining defendants (Scott Scepaniak, Dan Subach, Christopher Patton, and Kyra Schallhorn) violated her right to be free from unreasonable searches and seizures under the Fourth Amendment by engaging in continuous, covert video surveillance of her kennel unit for a two month period.[2]

The remaining defendants argue that they are entitled to qualified immunity. The threshold question in a qualified immunity defense is whether, given the facts taken in the light most favorable to the plaintiff, there is any merit to the underlying constitutional claim. *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Norfleet v. Webster*, 439 F.3d 392, 395

---

[2] While the State of Wisconsin/Department of Justice has been docketed as an individual defendant, the complaint does not allege claims against this entity. The Wisconsin Department of Administration is listed as an individual defendant, but the parties agree that any claims against the Department of Administration should be dismissed. *See Alkire v. Irving*, 330 F.3d 802, 812 n.7 (6th Cir. 2003) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (an arm of the state is not a person for purposes of liability under 42 U.S.C. § 1983)). Finally, the complaint alleges claims against John Palmer, Director of the Gaming Enforcement Bureau. Based upon the arguments made by the parties at summary judgment, the Court will proceed as if any claims against Palmer have been abandoned.

(7th Cir. 2006). If so, the Court inquires whether the right was clearly established at the time of the alleged injury; that is, whether a reasonable officer would have known that his actions were unconstitutional. *Saucier*, 533 U.S. at 202. Therefore, the Court begins with an analysis of Diercks' Fourth Amendment claim.

I. **FOURTH AMENDMENT**

The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, *Ker v. California*, 374 U.S. 23, 30 (1963), provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." The Fourth Amendment applies to civil caes brought under § 1983. Its "central requirement" is one of reasonableness. *Texas v. Brown*, 460 U.S. 730, 739 (1983). Reasonableness is measured by "examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

To prevail on her § 1983 claim, Diercks must prove that (1) the conduct complained of was committed under color of state law; and (2) the activity deprived a person of rights, privileges, or immunities secured by the constitution or laws of the United States. *See Case v. Milewski*, 327 F.3d 564, 566 (7th Cir. 2003). There being no dispute that the Defendants were acting under color of law, the only inquiry is whether the Defendants' actions violated the Fourth Amendment.

A. **Reasonable Expectation of Privacy**

To state a Fourth Amendment claim, Diercks must establish that she had a reasonable expectation of privacy in her kennel unit. A reasonable expectation of privacy exists under the Fourth Amendment when an actual or subjective expectation of privacy is exhibited, and the expectation is one that society is prepared to recognize as reasonable.

*See Katz v. United States*, 389 U.S. 347, 361 (1967). To determine whether an expectation of privacy is reasonable, courts examine whether the plaintiff: (1) was lawfully on the premises; (2) had a possessory interest in the premises; (3) had a right to exclude others; (4) had a subjective expectation of privacy; and (5) took normal precautions to protect privacy. *United States v. DuPrey*, 895 F.2d 303, 309 (7th Cir. 1989) (abrogated on other grounds).

Defendants concede that Diercks was lawfully on the premises pursuant to her kennel unit lease contract. Diercks had a right to exclude others because she had copies of keys to the kennel unit and could exclude members of the public from entering the kennel. Defendants also concede that Diercks had a subjective expectation of privacy in her dog kennel. Finally, Defendants do not dispute that Diercks took normal precautions to protect her privacy in the kennel unit.

Defendants only argument under the totality of the circumstances inquiry is that Diercks had a tenuous possessory interest in her kennel unit. Defendants maintain that Diercks waived her right to privacy in the kennel unit pursuant to the language in the kennel contract which gives the Defendants unrestricted access to her kennel at all times. The term "access," given its ordinary and reasonable meaning, means "permission, liberty, or ability to enter, approach, or pass to and from a place or to approach or communicate with a person or thing." *Merriam-Webster Online*, http://www.m-w.com/dictionary/access. Therefore, the kennel contract language merely informs the kennel owner that an unannounced physical search can be conducted, without a warrant, at any time without prior notice. Diercks still maintained a possessory interest in the kennel and did not completely waive her right to privacy in the unit.

Courts have uniformly held that an owner or operator of a business, subject to random and unannounced searches by regulatory authorities, has a legitimate expectation of privacy in commercial property, which society is prepared to consider as reasonable. *See New York v. Burger*, 482 U.S. 691, 699 (1987) (citing *Katz*, 389 U.S. at 361). Therefore, the Court finds that Diercks had a legitimate and reasonable expectation of privacy in her greyhound kennel.

### B. Pervasively Regulated Industry

It is true that the expectation of privacy in commercial premises is "different from, and indeed less than, a similar expectation in an individual's home." *Burger*, 482 U.S. at 700 (citing *Donovan v. Dewey*, 452 U.S. 594, 598-99 (1981)). Thus, while a "search of a private residence generally must be conducted pursuant to a warrant in order to be reasonable, a warrantless administrative search of commercial property does not *per se* violate the Fourth Amendment." *Lesser v. Espy*, 34 F.3d 1301, 1305 (7th Cir. 1994) (internal citations omitted). This is particularly so with respect to "closely regulated" or "pervasively regulated" industries. *See, e.g., United States v. Biswell*, 406 U.S. 311 (1972). Certain industries have "such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978).

It is not merely the historical duration of the regulatory scheme that informs the doctrine. *See Dewey*, 452 U.S. at 605-06. Rather, the doctrine is defined by "the pervasiveness and regularity" of the regulation and the effect of such regulation upon an owner's expectation of privacy. *Burger*, 482 U.S. at 701. Put another way, government regulation is pervasive if the "regulatory presence is so comprehensive and defined that

Case 2:02-cv-00988-RTR   Filed 12/20/06   Page 11 of 20   Document 92
-11-

the business owner cannot help but be aware that his commercial property will be subject to periodic inspections undertaken for specific purposes." *Lesser*, 34 F.3d at 1306 (citing *Burger*, 482 U.S. 705 n.16).

Chapter 562 of the Wisconsin Statutes is devoted entirely to the regulation of greyhound racing and on-track pari-mutuel wagering. Chapter 562 regulates the humane treatment of animals; racing security and operations; licensing of all track owners and their employees and contractors, greyhound owners, their employees and contractors, trainers, pari-mutuel and security personnel and other racing officials; qualifications of the WDOG administrator and employees; greyhound registration; the age of the wagering public; medication and tampering with racing animals; the types of wagering and payout; and taxation of racing revenues.

Chapter 562 also prohibits certain wagering and racing activities, assigns penalties, including forfeitures and fines, and authorizes the DOJ to enforce the entire chapter. Wis. Stat. § 562.01-562.13. The Chapter is supported by nineteen Wisconsin Administrative Code Chapters, which provide further depth to the regulatory scheme. The scheme is such that a licensed kennel owner could not help but be aware that her commercial property would be subject to periodic inspection. Courts have held that similar industries are pervasively regulated. *See, e.g., Lesser* (rabbitries); *Anobile v. Pelligrino*, 284 F.3d 104 (2d Cir. 2003) (horseracing). Therefore, greyhound racing in Wisconsin qualifies as a pervasively regulated industry.

However, even in the context of a pervasively regulated industry, a warrantless inspection will not be considered reasonable unless the following criteria are met. First, there must be a substantial governmental interest that informs the regulatory scheme

pursuant to which the inspection is made. Second, the warrantless inspections must be necessary to further the regulatory scheme. Third, the statute's inspection program must perform the two basic functions of a warrant: it must advise the owner of the premises that the search is being conducted pursuant to the law and within a properly defined scope; and it must limit the discretion of the inspecting officers. *See Lesser*, 34 F.3d at 1306 (citing *Burger*, 482 U.S. at 702). The Court will discuss each requirement separately.

### 1. Substantial Governmental Interest

A warrantless inspection will not be considered reasonable unless there is a substantial governmental interest that informs the regulatory scheme pursuant to which the inspection is made. *See Lesser*, 34 F.3d at 1306 (citing *Burger*, 482 U.S. at 702). There is clearly a substantial governmental interest which underlies this regulatory scheme. Wisconsin has an interest in the health and safety of greyhounds used for racing, and also in the fairness of the gambling that takes place at greyhound racing tracks.

### 2. Necessity of Warrantless Video Surveillance

A warrantless inspection in a pervasively regulated industry must also be necessary to further the regulatory scheme. *See Lesser*, 34 F.3d at 1306 (citing *Burger*, 482 U.S. at 702). A random, unannounced inspection like those in *Dewey* and *Burger* would likely pass constitutional muster. However, this case is unique because the warrantless search continued uninterrupted for two months via video surveillance. Covert video surveillance, while not a Fourth Amendment violation *per se*, is subject to strict constitutional requirements. A warrant for video surveillance satisfies the Fourth Amendment only if normal investigative techniques were tried and either failed, appeared

unlikely to succeed, or appeared to be too dangerous. *See Torres*, 751 F.2d at 883-84; *see also United States v. Falls*, 34 F.3d 674, 680, 682 (8th Cir. 1994); *United States v. Koyomejian*, 970 F.2d 536, 542 (9th Cir. 1992); *United States v. Mesa-Rincon*, 911 F.2d 1433, 1438 n.5 (10th Cir. 1990).

Defendants argue that covert video surveillance was necessary because of the difficulty of detecting Boldenone in a greyhound's system. That at least arguably rules out urine testing as a means to detect the suspected illegal behavior, but it is unclear why a random, unannounced physical search would have been presumptively ineffective. Defendants did not attempt to obtain a warrant for their video surveillance, and they did not even attempt a random, unannounced in-person search of Diercks' kennel. Defendants have not argued, much less established, that a random, unannounced in-person search of Diercks' kennel would have been unlikely to succeed if tried. Defendants make a vague reference to the element of surprise, but random and unannounced physical inspections are routine and expressly authorized by the statutory and regulatory scheme. The element of surprise could have been effectively maintained using less invasive procedures. Therefore, Defendants have failed to establish the necessity of covert video surveillance.

### 3. Adequate Substitute for a Warrant

Finally, a warrantless search of a pervasively regulated industry must provide an adequate substitute for a warrant. This is accomplished, in part, by limiting the discretion of the inspecting officers. *See Lesser*, 34 F.3d at 1306 (citing *Burger*, 482 U.S. at 702). In the context of covert video surveillance, the discretion of the officers must be limited to the type of communication sought to be intercepted and the particular offense to which

Case 2:02-cv-00988-RTR   Filed 12/20/06   Page 14 of 20   Document 92
-14-

it relates. *See Torres*, 751 F.2d at 883; *Falls*, 34 F.3d at 680; *Koyomejiam*, 970 F.2d at 542; *Mesa-Rincon*, 911 F.2d at 1438 n.5.

Defendants have provided no indication that the scope of the surveillance was limited in any manner. It is "unarguable that television surveillance is exceedingly intrusive . . . and inherently indiscriminate, and that it could be grossly abused to eliminate personal privacy as understood in modern Western nations." *Torres*, 751 F.2d at 882; *United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) ("This type of surveillance provokes an immediate negative visceral reaction; indiscriminate video surveillance raises the spectre of the Orwellian state"). Hidden video surveillance "may be considered far more invasive than conventional investigative techniques – for the camera sees all, and forgets nothing." *Constitutionality of Secret Video Surveillance*, 91 A.L.R. 5th 585, § 2 (2001). By all accounts, Defendants' uninterrupted video surveillance was unlimited in scope and afforded the inspecting officers nearly unbridled discretion.[3] Therefore, the manner of the Defendants' surveillance failed to provide an adequate substitute for a warrant.

**C. Summary**

Diercks had a reasonable expectation of privacy in her kennel unit at Geneva Lakes. While greyhound racing in Wisconsin is a pervasively regulated industry, the use of video surveillance in this case was not necessary to achieve Defendant's investigative goals and also was not tailored to limit the discretion of the investigating officers.

---

[3] Furthermore, courts have held that the period of interception must not be longer than necessary to achieve the objective of the authorization, generally no more than 30 days. *United States v. Torres*, 751 F.2d 875, 883 (7th Cir. 1984). The period of interception in this case was two months, twice as long as the baseline standard.

Therefore, the Court must conclude that Defendants' warrantless video surveillance of Diercks' dog kennel violated the Fourth Amendment.[4]

## II. QUALIFIED IMMUNITY

Government officials performing discretionary functions are shielded from damage liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The application of qualified immunity is a question of law for the court, and is therefore appropriate for disposition on summary judgment. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*).

The Court must determine whether the applicable constitutional standards were "clearly established" at the time the violation took place. *See Saucier*, 533 U.S. at 201. The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The relevant inquiry is whether it would be clear to a reasonable officer that his conduct was "unlawful in the situation he confronted. . . . If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202. It is the plaintiff's burden to point to "closely analogous cases decided prior to the defendants'

---

[4] While the Court need not reach Diercks' collateral estoppel/issue preclusion argument, an Administrative Law Judge concluded that the three-part test set forth in *Dewey* and *Burger* was not satisfied by the defendants' continuous video surveillance of Diercks' dog kennel. (Docket No. 73-5, Final Decision of the Department of Administration, ¶ 31). Judge Peter Anderson held that there "is no certainty or regularity afforded a regulated entity when the method of 'inspection' consists of secret, continuously videotaped surveillance. Moreover, DOA has not offered an explanation why obtaining a warrant would have frustrated the surveillance, other than by the possibility of its being refused by a neutral magistrate." *Id.*

challenged actions." *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (citation omitted).

It was objectively reasonable, based on clearly established law at the time of the violation, for the Defendants to conclude that greyhound racing in Wisconsin is a pervasively regulated industry, and that Wisconsin has a substantial interest in regulating that industry. The great majority of cases in the context of a pervasively regulated industry uphold the constitutionality of the searches. *See, e.g., Dewey* (mining facilities), *Burger* (junkyard), *Lesser* (rabbitries), and *Biswell* (firearms), *supra*.

The Court's concern, with respect to the constitutionality of the searches, is with the necessity and scope of the video surveillance. However, the "unrestricted access" "at all times" language in the lease agreement, mandated by Wisconsin statute and administrative code, supports the conclusion that Diercks waived any expectation of privacy in her kennel. While the Court finds, as a matter of law, that this language does not constitute a waiver of Diercks' right to be free from covert video surveillance in her kennel unit, it was objectively reasonable for the Defendants to conclude that Diercks' rights were waived based on the broad language in the lease agreement.

Furthermore, cases have held that individuals may waive their Fourth Amendment rights via contract. *See, e.g., Zap v. United States*, 328 U.S. 624, 627 (1946) (plaintiff waived right to privacy where contract with the Navy provided that "the accounts and records of the contractor shall be open at all times to the Government and its representatives"); *United States v. Brown*, 763 F.2d 984, 987-88 (8th Cir. 1985) ("We see no constitutional infirmity in the government requiring a provider to agree to maintain records . . . and to permit periodic audits of those records as a condition for [contracting

with the government]"); *United States v. Griffin*, 555 F.2d 1323, 1325 (5th Cir. 1977) (pharmacist had consented to warrantless search of books and records when he knowingly and voluntarily entered into a contract in which he agreed to maintain and make records available for inspection); *United States v. Jennings*, 724 F.2d 436, 448 (5th Cir. 1984) (citing *Griffin* for identical holding); *First Alabama Bank v. Donovan*, 692 F.2d 714, 718-20 (11th Cir. 1982). Again, while the Court finds that Diercks did not waive her right to privacy in her kennel unit, cases exist which support the conclusion that a waiver is possible.

Therefore, taking into account the relaxation of the warrant requirement in the context of a pervasively regulated industry, the body of law which upholds Fourth Amendment waivers via contract, and the broad language allowing unrestricted access in the lease agreement, it was objectively reasonable for the defendants to conclude that the installation of video surveillance in Diercks' kennel unit without a warrant was not a constitutional violation. At a minimum, the cases which uphold Fourth Amendment waivers, as applied to the instant case, are in tension with the general Fourth Amendment law governing the scope and necessity of covert video surveillance. Therefore, the applicable law was not clearly established at the time the violations occurred.

Furthermore, Defendants sought and obtained two pre-surveillance opinions concerning the legality of their actions, one from Department of Justice attorneys, the other from the District Attorney for Walworth County. Both times, Defendants were told that a warrant was not required prior to conducting the surveillance. Courts have noted that there is "room in the qualified immunity calculus for considering both the fact of a pre-arrest consultation and the purport of the advice received. As a matter of practice, the

incorporation of these factors into the totality of the circumstances is consistent with an inquiry into the objective legal reasonableness of an officer's belief." *Cox v. Hainey*, 391 F.3d 25, 35 (1st Cir. 2004). The Seventh Circuit has held that an officer is entitled to qualified immunity where a prosecutor advised that there was probable cause for an arrest. *See Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004). While a favorable opinion from a prosecutor does not "give an officer absolute immunity from being sued . . . . it goes far to establish qualified immunity. Otherwise the incentive for officers to consult prosecutors – a valuable screen against false arrest – would be greatly diminished." *Kijonka*, 363 F.3d at 648.

Defendants cite *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006), where the court rejected a qualified immunity defense despite a pre-arrest consultation with a prosecutor. *Sornberger* is distinguishable, because in that case, the "officers themselves realized the weakness of their case, and therefore manipulated the available evidence to mislead the state prosecutor into authorizing [the] arrest." *Id.* at 1016. There is no indication in the record that the Defendants manipulated the process or acted in bad faith when they obtained their pre-surveillance opinions.

In short, qualified immunity is designed to give "public officials the benefit of legal doubts," and this case is no exception. *Elliot v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991). Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Bryant*, 502 U.S. 224 at 229. Defendants were acting on a legitimate, good faith, and objectively reasonable belief that their actions were in compliance with applicable constitutional

standards. Therefore, qualified immunity applies and shields the Defendants from liability.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Plaintiff's motion for leave to file excess pages in her reply brief [Docket No. 91] is **GRANTED**;

2. Defendants' motion for summary judgment [Docket No. 60] is **GRANTED**;

3. Plaintiff's motion for summary judgment [Docket No. 69] is **DENIED**; and

4. This matter is **DISMISSED** in its entirety.

Dated at Milwaukee, Wisconsin this 20th day of December, 2006.

**SO ORDERED,**

**s/ Rudolph T. Randa**
**HON. RUDOLPH T. RANDA**
**Chief Judge**